UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

GREGORY HAROLD POPE, and
MICHELLE BERNADETTE POPE,

    Plaintiffs,         CASE NO.: 0:21-cv-60456-WPD

v.

KAYE BENDER REMBAUM, P.L.,

    Defendant.

_____/

**KAYE BENDER REMBAUM P.L.'S MOTION
TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

  **COMES NOW** the Defendant, KAYE BENDER REMBAUM, P.L. (hereinafter "KBR"),

by and through its undersigned counsel, and pursuant to Rule 12 of the Federal Rules of Civil

Procedure, hereby files this Motion to Dismiss Plaintiffs' Second Amended Complaint, and in

support thereof states:

## I.  FACTUAL BACKGROUND

1.  This lawsuit pertains to claims under the Fair Debt Collection Practices Act, 15 U.S.C. §

  1692 *et seq.* (hereinafter "FDCPA"), and the Florida Consumer Collection Practices Act, Fla.

  Stat. § 559.72 *et seq.* (2020) (hereinafter "FCCPA").

2.  Plaintiffs are owners of Unit #1-2 of the SABAL RIDGE APARTMENT ASSOCIATION,

  INC. (hereinafter "the Association").

3.  The Association is the governing body for the Sabal Ridge Apartment Condominium, a

  condominium formed pursuant to Florida Statutes Chapter 718 *et seq.*

4.  Said Association is governed by the Bylaws and Declaration of Condominium recorded in

  the Public Records of Palm Beach County, Florida.

5.     Defendant is a law firm retained by the Association for attorney services on a variety of community related matters, including the collection of regular and special maintenance assessments from delinquent Unit owners.

6.     In response to a written demand for debt verification sent from Plaintiff's prior counsel, on March 9, 2020 Defendant delivered to said counsel a communication by both facsimile and email, which communication attached and incorporated a letter of explanation and other documents that included ledgers and official records of the Association, verifying the balance sought by the Defendant.   A complete copy of the Defendant's March 9, 2020 communication is attached hereto and incorporated herein as "Composite Exhibit "A".

7.     Thereafter, the parties, solely through counsel, exchanged email correspondence and ultimately agreed to a settlement of collection on the account for both the claimed regular and special maintenance assessments.

8.     Pursuant to said negotiation, and  nearly one year after the March 9th communication, Plaintiffs through their counsel, delivered a settlement payment to Defendant on February 3, 2021 in the sum of $18,709.50.

## II.     LEGAL STANDARDS GOVERNING MOTIONS TO DISMISS

9.     Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matters, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

10.    The pleading standard "does not require 'detailed factual allegations', but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quoting Twombly,

550 U.S. at 555).

11.     Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Iqbal</u>, 556 U.S. at 679.

12.     Rule 12(b)(6) FRCP states dismissal of a Complaint is appropriate "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Hirshon v. King & Spotting</u>, 467 U.S. 69, 73 (1984); *See also*, <u>Hazel v. School Board of Dade County</u>, 7 F.Supp.2d 1349, 1352 (S.D. Fla. 1998)(holding that a motion to dismiss will be granted when "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief"); <u>Mallo v. Public Health Trust of Dade County</u>, 88 F.Supp. 1376 (S.D. Fla. 2000).  A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. <u>Hazel</u>, 7 F.Supp.2d at 1349.

13.     Importantly, a complaint must allege facts properly setting forth the essential elements of a cause of action. <u>Hazel</u> at 1352.  Dismissal of a complaint is appropriate on the basis of a dispositive issue of law, or when there is no necessity to construe factual allegations contained within the complaint.  <u>Marshall Cty Bd. Of Ed. v. Marshall Cty. Gas Dist.</u>, 992 F.2d 1171 (11th Cir. 1993).  If the defendant demonstrates beyond doubt that the plaintiff can prove no set of fact to support his claim, then a motion to dismiss should be granted. <u>Mallo</u>, 88 F.Supp. at 1376.

14.     In addition, documents attached to the complaint may be considered as part of the pleadings in ruling on a motion to dismiss. <u>Reese v. Ellis, Painter, Ratterree & Adams, LLP</u>, 678 F.3d

1189, 1205 (11th Cir. 2007).  *Other documents may also be considered if they are central to or referenced in the complaint, or judicially noticed.*  LaGrasta v. First Union Sec. Inc., 358 F.3d 840, 845 (11th Cir. 2004)(citing Fed. R. Civ. P. 10(c)). (Emphasis added).

### III.  ARGUMENTS

*1.*     *COUNTS I THROUGH XI SHOULD BE DISMISSED BECAUSE THE COMPLAINT SEEKS INJUNCTIVE RELIEF YET NO SUCH DEMAND OR ANY BASIS TO SUPPORT SUCH A DEMAND IS INCLUDED IN THE SECOND AMENDED COMPLAINT*

15.     Plaintiff has most recently filed its "SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL / *INJUNCTIVE RELIEF SOUGHT*." (Emphasis added).

16.     Plaintiff has therefore put the Defendant on "fair notice" of its intent to obtain a judgment for injunctive relief. Twombly, 550 U.S. at 555.

17.     However, from the body of the pleading thereafter, it appears beyond doubt that the Plaintiffs "can prove no set of facts in support" that would entitle it to their claim for an injunction. Mallo, 88 F. Supp at 1376.

18.     "A party seeking a permanent injunction must plead and prove a clear legal right, the inadequacy of a remedy at law, and that an irreparable injury will occur if such relief is not granted." Dear v. Q Club Hotel, LLC, No. 15-60474, 2015 WL 4273054 (S.D. Fla. July 14, 2015).

19.     Despite the request for injunction and requirement to plead the elements above, nowhere do the Plaintiffs in their Second Amended Complaint ever state any facts or allegations supportive of a claim for an injunction.

20.     In fact, EVERY "Wherefore Clause" plead at the conclusion of Counts 1 through 11 of the Second Amended Complaint request the same award of: " [1] actual damages; [2] statutory

damages; [3] costs; and [4] reasonable attorney's fees."

21. Nowhere in the entirety of the allegations in the Plaintiffs' Second Amended Complaint does Plaintiff assert any claim or any of the required elements for an injunction.

22. This discrepancy between the relief indicated to be sought and the relief actually plead has put the Defendant in a position where it is unable to properly discern the scope of the relief sought in the Plaintiffs' action.

23. Based on this confusion, the Defendant is not meaningfully able to respond to the pleading, and this Honorable Court therefore has no other alternative but to dismiss the Second Amended Complaint.

## 2. COUNTS 1 THROUGH 11 OF THE SECOND AMENDED COMPLAINT FAIL TO PROPERLY ALLEGE CONCRETE AND PARTICULARIZED INJURY.

24. The gravamen of all of Plaintiffs' claims in the Second Amended Complaint is they suffered vaguely plead "harm" due to : (1) the March 9, 2020 attorney-to-attorney fax communication that allegedly failed to include the "magic words" of disclosure required pursuant to § 1692e(11); and / or (2) the amounts sought in various correspondence from the Defendant were somehow not authorized by the governing Declaration of Condominium and Florida Law.

25. In Spokeo v. Robins, 136 S. Ct. 1540, 1548 (2016), the United States Supreme Court found that plaintiff's pleading of a mere technical violation of the Fair Credit Reporting Act, without a showing of adequate harm failed to trigger the Article III standing needed to invoke the Court's subject matter jurisdiction (" . . . a bare procedural violation, divorced from any concrete harm, {does not} satisfy the injury-in-fact requirement of Article III").

26. The test to determine Article III standing relies on three elements:

> The plaintiff must have: (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial outcome. Id. at 1546.

27. Moreover, "injury in fact is a constitutional requirement and it is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." Id. at 1547.

28. The Seventh Circuit Court of Appeals just recently applied the Spokeo ruling to its review of a technical violation of § 1692c of the FDCPA in the case of Pennel v. Global Trust Management, 990 F. 3d 1041 (7th Cir. 2021). There, the plaintiff claimed the creditor sent a dunning letter directly to her in contravention to earlier written instructions from the plaintiff directing all future communications be sent to her counsel.

29. However, the only injury alleged by the consumer was for "stress and confusion". The Plaintiff merely tracked the statutory language for harm found in § 1692 without any further elaboration ("The only injuries Pennel included in her complaint were stress and confusion, and those do not suffice for standing"). Id. at 1045.

30. The Court noted: "The Plaintiff must establish standing at the time the suit is filed and cannot manufacture standing afterwards." Id. at 1044.

31. In applying Spokeo, the Seventh Circuit rejected the plaintiff's de minimus harm allegation of "stress and confusion" as inadequate despite what appears to be automatic award of statutory damages in § 1692:

> ". . . a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it. Article III standing requires a **concrete injury** even in the context of a statutory violation." Spokeo, 136 S.Ct. at 1543. (Emphasis added).

32.   Ultimately, the Seventh Circuit held that by alleging only that a debt collector's dunning letter caused her stress and confusion, the consumer merely pointed to a statutory violation of the Act, which was insufficient to satisfy the concreteness element of the injury-in-fact requirement for Article III standing. The Court found that the consumer failed to show that receiving the debt collector's notice led her to change her cause of action or put her in harm's way, and therefore affirmed the District Court's dismissal of the Complaint.

33.   Moreover, even though the consumer Pennel alleged in her supplemental memorandum on appeal that the dunning letter invaded her privacy, that argument would not be entertained in analyzing standing, as she did not allege any such injury in her operative complaint. Pennel, 990 F.3d at 1045. *See also*, Brunett v. Convergent Outsourcing, Inc., 982 F. 3d 1067, 1069 ("Brunett tells us that the letter was 'intimidating as well as 'confusing'. Our analysis is the same. Attaching an epithet such as "intimidation" to a letter does not show that injury occurred. Talk is cheap, but where is the concrete harm? That's what the Constitution requires, and Brunett does not allege any."); United States v. All Funds on Deposit with R.J. O'Brien & Assoc., 783 F. 3d 607, 616 (7th Cir. 2015) ("purely psychological harm" does not establish Article III standing).

34.   In Hagy v. Demers & Adams, 882 F.3d 616 (6th Cir. 2018), the Sixth Circuit Court of Appeals was faced with a similar situation as the case at bar. In that case, the attorney delivering a settlement letter on behalf of a creditor failed to include the "magic words" disclosure required pursuant to the FDCPA. As in the case at bar, the Plaintiff in Hagy alleged the mere technical failure to include the statutory disclosure language automatically provided a claim for damages.

35.    The Sixth Circuit reasoned that creation by Congress of a right to "automatic" statutory damages did not trump the "irreducible constitutional minimum that requires [Plaintiffs] to show: (1) particular and concrete injury; (2) caused by [Defendant]; and (3) redressable by the courts." Id. at 720.

36.    Thus, as the Hagy Court reasoned, "we have yet to take a position" on the lack of disclosure language in the attorney letter as "Article III of the Constitution does not authorize federal courts to decide theoretical questions." Id.

37.    In the case at bar, Plaintiffs have failed to allege *any* actual *concrete* harm as it relates to the alleged failure to include the statutory disclosure language in the March 9, 2020 attorney-to-attorney fax communication, or in describing valid amounts due in subsequent letters, thus rendering the allegations of harm in the Second Amended Complaint theoretical in nature and subject to dismissal for failure to establish Article III standing.

38.    In fact, while the Plaintiffs engage in a lengthy discussion of the need to prove "concrete" damages above and beyond simple technical violations, Plaintiffs' still fail to claim any harm other than the vague statements: "made payments in response to" and "wasted time or money in determining to do so" in Paragraph 92 of the Second Amended Complaint.

39.    The harm alleged in these paragraphs is solely targeted to the dispute over the legitimacy of the account charges, and the negotiated settlement payment delivered thereon. These allegations do not state that the alleged failure to include the technical words of disclosure on the March 9, 2020 fax letter or any other letter to Plaintiff counsel were deceitful, or created any harm whatsoever. Nor do they allege the Plaintiffs were mislead as to the amounts sought, or that they would have otherwise taken a different course of action in

response to any of the "offending" letters attached to the Second Amended Complaint.

40. As the Supreme Court ruling in <u>Spokeo</u> and the Circuit Court opinions cited herein state, "talk is cheap, but where is the concrete harm?". <u>Brunett</u> 983 F. 3d at 1069. The Plaintiffs in the case at bar completely fail to allege how they have been materially harmed in any way, nor have they suggested that they would have acted differently in the absence of such "violations".

41. Plaintiff's allegations of harm in the Second Amended Complaint are therefore pure conclusions and fail to rise to the specific level of damages needed, pursuant to Article III, to sustain a claim under § 1692 of the FDCPA or the Florida FCCPA.

42. Additionally, the Courts have specifically rejected the exact types of harm alleged by Plaintiffs as being actionable. <u>Brunett</u>, 982 F. 3d at 1069.

43. As to all Counts in the Second Amended Complaint, there is a total absence of any claim of direct harm as a result of the alleged failure to include the statutory disclosure language in a fax correspondence to the Plaintiffs, the Defendant's efforts to collect a legitimately past due balance, or the alleged inclusion of the Defendant's account number on an Exhibit filed earlier in the case at bar, and this Honorable Court therefore has no other alternative but to dismiss same.

   3.   ***ASSUMING ARGUENDO THE PLAINTIFFS HAVE PLEAD ADEQUATE HARM, TAKEN AS A WHOLE, THE MARCH 9, 2020 COMMUNICATION INCLUDES THE MANDATORY DISCLOSURE LANGUAGE REQUIRED BY THE FDCPA AND COUNT 3 MUST BE DISMISSED.***

44. Pursuant to <u>LaGrasta</u> cited above, while reviewing a Motion to Dismiss, this Honorable Court is entitled to see the full and complete March 9, 2020 (Letter #2) communication that includes all other papers to which the communication was attached and delivered to counsel

for the Plaintiffs, including the email transmittal form. Said complete documents are central to the Plaintiffs' claim, and are indisputably referenced therein.

45. Exhibit "A" attached hereto is a copy of the Defendant's complete communication correspondence constituting the written verification of the amounts sought in the initial collection letter sent in this matter.

46. While the faxed copy of the March 9, 2020 attorney-to-attorney letter arguably does not specifically include the "magic" FDCPA words of disclosure, said fax was a copy of the overall communication also emailed to Defense counsel, which email very clearly included the required disclosure language.

47. In fact, Letter #2 was delivered to Plaintiffs' counsel both through email and facsimile. Said email did not just include the letter, but also unquestionably contained the required disclosure.

48. The attached Exhibit "A" includes a *full* correct copy of the emailed verification letter sent to the Defendant *in pari materia* with the faxed verification letter. The face of the email transmittal page clearly and unquestionably contains the required disclosure:

> **This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.** (Emphasis added).

49. Thus, from the face of the Second Amended Complaint, this Honorable Court can determine that Plaintiffs' allegation of failure to disclose under the FDCPA is obviously factually incorrect, and that Count 3 should be dismissed.

**A)** **Plaintiff's reliance on the 11th Circuit's Bishop case is misplaced as the March 9, 2020 attorney-to-attorney letter was not an initial communication, and should therefore be reviewed under the "competent attorney" standard**

50. Plaintiff contends generally that the March 9, 2020 attorney-to-attorney "Collection Letter"

which in reality was the debt verification letter, is a communication that requires inclusion of the "magic words" pursuant to the case of <u>Bishop v. Ross Earle & Bonan, P.A.</u>, 817 F.3d 1268 (11th Cir. 2016).

51. However, the facts of <u>Bishop</u> are different from the case at bar.  In <u>Bishop</u>, the Defendant failed to include certain words in the *initial communication* which requires the full elaboration of debtors rights.  The debt collector's omission (failure to state that a dispute could be sent in writing) was viewed as deceptive, and therefore material enough for the Court to apply the "least sophisticated consumer" standard to sustain the alleged FDCPA violation.

52. The <u>Bishop</u> Court distinguished the facts of that case with those from other Circuits that have applied the more lenient "competent lawyer" standard that states the failure to include § 1692e disclosure language in a subsequent attorney-to-attorney communication does not rise to the level of a violation of the FDCPA.

53. Bishop cites to the Seventh Circuit Court of Appeal's ruling in  <u>Evory v. RJM Acquisitions Funding</u>, 505 F. 3d 769 (7th Cir. 2007) as the "seminal" case that applies the "competent lawyer" standard analysis to a technical disclosure violation alleged under § 1692e.

54. In <u>Evory</u>, the attorney-to-attorney to communication at issue was a settlement letter that failed to state the shorter disclosure language required by § 1692e(11) to be included on *subsequent* communications.

55. In finding that the failure to state the § 1692(e)11 disclosure did *not* rise to the level of a violation of the FDCPA, the <u>Evory</u> Court stated:

> We are exceedingly doubtful that any lawyer involved in representing debtors would be deceived by the settlement offers made by debt collectors, and doubt therefore that any

Page 11 of 20

> cases based on such offers could survive summary judgment
> or even a motion to dismiss were the offer directed to the
> consumer's lawyer rather than to the consumer. This
> illustrates our earlier point about the importance of
> distinguishing between lawyers and unsophisticated
> consumers in applying section 1692e. Id. at 774.

56.     The 11th Circuit in Bishop reasoned: "Evory appears to limit the 'competent lawyer' standard

to misleading and deceptive behavior; misrepresentations are elevated under the familiar

'least sophisticated consumer standard'". Bishop, 817 F. 3d at 1273.

57.     The Bishop opinion also cites to Dikeman v. National Educators, Inc., 81 F. 3d 949 (10th Cir.

1996), where the § 1692e(11) violation alleged was quite similar to the case at bar. There,

the Defendant failed to include the "magic words" in a *verbal* response to the debtor's

attorney. The Tenth Circuit Court of Appeals stated:

> Accordingly, we hold that the fact of the debt verification and
> its content, viewed in context, was adequate to disclose to an
> attorney hired to represent the debtor that the debt collector
> was attempting to collect a debt and that any information
> obtained would be used for that purpose within the meaning
> of § 1692e(11). A disclosure pursuant to § 1692e(11) by
> verbal statement would be a pointless formality and is not
> required in such a situation.

58.     In fact, the Bishop Court *only* declined to extend the Evory and Dikeman "competent

attorney" standard to a different scenario where the material omission from the *initial*

communication "did not inform Bishop that she must dispute her debt 'in writing' to trigger

verification rights under § 1692g(b)." Bishop, 817 F. 3d at 1273. The 11th Circuit found

such an omission was so material as to be deceptive, thus triggering the harsher "least

sophisticated consumer" standard.

59.     Contrary to the scenario in Bishop, the alleged failure to properly include § 1692e "magic

words" in the fax version of Letter #2 in the case at bar is far similar to the facts found in

Evory and Dikeman. The March 9, 2020 letter at issue was a *subsequent* communication that came after months of otherwise compliant attorney-to-attorney emails, telephone conferences, and letters. The subject communication was also emailed substantially contemporaneous with the fax copy, and the email transmittal *did* unquestionably include the required § 1692e(11) disclosure language.

60.   When applying the Bishop standard, the alleged lack of disclosure language on the actual March 9th fax copy of the communication in the case at bar was so immaterial that it could never be construed by any fact finder to be "misleading" or "deceptive".

61.   As such, this Honorable Court should apply the "competent attorney" standard when analyzing the claim of a lack of § 1692e(11) language Plaintiffs allege on the face of the Second Amended Complaint and its exhibit, to easily determine beyond any doubt that Count 3 is factually and legally flawed, and should be dismissed with prejudice.

**2.   COUNTS 1 TO 10 SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION AS DEFENDANT ENGAGED IN COLLECTION OF AMOUNTS CLEARLY AUTHORIZED BY CONTRACT AND STATUTE.**

62.   The entirety of the Defendant's communications raised by Plaintiffs' Second Amended Complaint, including the letter of March 9, 2020 (Composite Exhibit "A") are proper verifications of all contested debits and credits on the account, and include Association records supporting both the regular and special maintenance assessment installments charged thereon.

63.   Without any factual specificity, Plaintiffs allege in conclusory fashion in all Counts that despite being provided a comprehensive balance explanation with supporting documentation in the March 9, 2020 debt verification letter,  the amount sought is nevertheless somehow

"exceedingly unlawful" , "not explicitly authorized by the Agreement underlying the Consumer Debt or explicitly authorized by statute", and that Defendant "asserted a right which it knew did not exist".

64.    In K.R. Exchange Services, Inc., 48 So. 3d 889, 892 (Fla. 3DCA 2010), the Third District Court of Appeal found that: "To withstand dismissal, however, a plaintiff must allege more than the 'naked legal conclusion' . . . ."

65.    Florida's Condominium Act, Chapter 718, provides primary authorization for the charges sought against, and ultimately paid for, by the Plaintiffs. Pursuant to Fla. Stat. § 718.116 (3) (2020):

> Assessments and installments on assessments which are not paid when due bear *interest* at the rate provided in the declaration, from the due date until paid. The rate may not exceed the rate allowed by law, and if no rate is provided in the declaration, interest accrues at the rate of *18 percent per year*. . . . Any payment received by an association must be applied first to any interest accrued by the association, then to any administrative late fee, then to any costs and reasonable attorneys fees incurred in collection, and then to the delinquent assessment. *The foregoing is applicable notwithstanding any purported accord and satisfaction, or any restrictive endorsement, designation, or instruction placed on or accompanying a payment*. The preceding sentence is intended to clarify existing law. (Emphasis added).

66.    Contrary to Plaintiffs' allegations, in accord with Chapter 718, Article XXVII of the Declaration of Condominium, as amended, governing the subject property and Parties, recorded in the Public Records of Palm Beach County at O.R. Book 2831, Page 418 clearly provides, in relevant parts:

> G:    When in default, the delinquent assessment or delinquent installment thereof due to ASSOCIATION *shall bear interest at the highest lawful rate per annum* until   such   delinquent   assessments   or

> installments thereof, and all interest due thereon, has
> be paid in full to ASSOCIATION. (Emphasis added).

67.   Additionally, originally recorded Article XXVII, Section K states:

> K.   The lien granted unto ASSOCIATION . . . shall
> include only assessments which are due and payable
> when the claim of lien is recorded, plus ***interest***, costs,
> attorney's fees, advances to pay taxes . . . all as
> provided.      (Emphasis added).

68.   Because the Plaintiffs have directly referenced both the original and amended Declaration

provisions multiple times in the Amended Complaint, and said documents are publicly

recorded and subject to judicial notice, pursuant to <u>Lagrasta</u> they may be considered by this

Honorable Court in reviewing the Second Amended Complaint.  Plaintiff therefore attaches

correct copies of the documents hereto as Composite Exhibit "B".

69.   The foregoing excerpts from both the publicly recorded Declaration, as amended, and

Chapter 718, Florida Statutes, fully and completely substantiate the contractual and statutory

legal authority for the Defendant law firm to advance collection of the regular and special

maintenance assessments and any interest thereon, at the highest lawful rate (i.e. 18%)

collected by agreement of the Parties in this case.  They are referenced in multiple paragraphs

of the Second Amended Complaint, are central to the Plaintiffs' claims, and, as publicly

recorded documents, are subject to judicial notice by this Honorable Court.   Most

importantly, ***they unequivocally establish that the interest rate of 18% referenced in all of***

***the communications to Plaintiff was authorized and correct in direct contradiction to the***

***many allegations to the contrary in the Second Amended Complaint.***

70.   In fact, the account detail included in the March 9, 2020 communication and all other letters

from Defendant demanded amounts of interest, costs, and attorneys fees directly

contemplated by multiple sections of the Declaration.  Argument to the contrary is bogus.

71.   Because the Plaintiffs are not challenging the actual computation of the amounts of the assessment installments, funds collected,  the "reasonableness" of the attorneys fees or costs charged, their only dispute is founded their factually incorrect assertion that the interest rate should otherwise be "8%".

72.   Additionally, notwithstanding their agreement to the settlement amount, Plaintiffs' allegation of "payment under protest" of the $18,709.54 is of no import.  As cited herein, Chapter 718, Florida Statutes (2020), specifically rejects the notion of payment of duly owed amounts to an Association with a restrictive endorsement or similar words of limitation.

73.   Plaintiffs' delivery of the mutually negotiated sum to Defendant, regardless of the meaningless words "payment under protest" stated in the cover letter (but notably *not* on the actual check), acted as full settlement of disputes between the Plaintiffs and the Association, and did not otherwise confer liability upon the Defendant law firm.

74.   Plaintiffs' Complaint therefore does not present any facts actionable under the FDCPA or FCCPA against the Defendant for any collection conduct "not authorized by law" and  is rather a series of "naked legal conclusions" unsupported by even the most basic of facts, requiring dismissal.  See, K.R. Exchange, 48 So. 3d at 892.

75.   Based on the foregoing "naked conclusions" and obvious supporting contractual and statutory authority fully supporting the collection of interest, costs, and attorneys fees incurred in the course of collection of regular and special assessment installments, Counts 1 through 10 must be dismissed accordingly as a matter of law.

   *3.   **THE MANDATORY DISCLOSURE INCLUDED IN THE DEFENDANT'S FIRST COMMUNICATION CONFORMS WITH BOTH FLORIDA AND AS SUCH, FEDERAL LAW AND COUNTS 1 THROUGH 6 SHOULD BE***

**_DISMISSED._**

76.   Plaintiffs' do not allege that Defendant's initial communication (Letter #1) fails to include all the disclosure language mandated by both the FDCPA and FCCPA.

77.   Rather, Plaintiffs take issue with the additional language included in the disclosure that states: "However, the law does not require the Association or this Law Firm to wait that entire period to attempt to collect the debt. For this reason, you are required to make the payment as specified above."

78.   The statements in Defendant's initial communication are in fact true. Provided the consumer does not deliver a written demand for verification, neither Federal nor Florida Law require the creditor to cease collection activities. Moreover, unless such a demand for verification is made and the collection is put on hold, the consumer still has the obligation to timely comply with the payment deadline stated in the initial communication letter.

79.   In fact, in the case at bar, NO unauthorized collection activity is alleged to have taken place between Plaintiffs' delivery of their demand for verification the time when Defendant delivered its March 9, 2020 debt verification response (Letter #2).

80.   Said response (Letter #2) clearly states that it serves as a "full and complete verification of the Plaintiff's written debt inquiry." Thus, on their face, Letters #1 and 2 comply with both Florida and Federal Law. Plaintiff allegations to the contrary are simply "naked conclusions" unsupported by any facts and must be dismissed.

81.   As the mandatory disclosure language was in _pari materia_ properly included in the first communication, and the Defendant responded to the written demand with a full verification, there is no basis in fact or law to support the Plaintiff's claims in Counts 1 through 6 of the Second Amended Complaint, and they should be dismissed by this Honorable Court

accordingly.

4.     **COUNTS 7 THROUGH 10 FAIL TO PLEAD OPERATIVE FACTS, ARE EMPTY CONCLUSIONS OF LAW, AND SHOULD THEREFORE BE DISMISSED.**

82.    Counts 7, 8, 9, and 10 of the Second Amended Complaint all allege violation of various provisions of 15 U.S.C. § 1692, *et seq.*

83.    Plaintiff repeatedly accuses the Defendant of "falsely representing the character and amount of the Consumer Debt", or the Plaintiff "did not have the [lawful] authority to collect."

84.    As demonstrated herein, Defendant's collection efforts were authorized by Florida Law and the governing Declaration of Condominium, and Plaintiff has not challenged any of the credits or debits stated on the various ledgers delivered to them in this case.

85.    As such, the alleged violations of the Defendant are mere speculation and do not include any specific facts to render them more than mere "naked conclusions," and Counts 7 through 10 should be dismissed accordingly.

86.    As Counts 7 through 10 are simple formulaic "naked conclusions" devoid of any operative facts, they should be dismissed by this Honorable Court.

5.     **COUNT 11 OF THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED BECAUSE THE ACCOUNT INFORMATION IS NOT PROTECTED INFORMATION AND ITS RELEASE CAUSED NO ACTIONABLE DAMAGE.**

87.    Plaintiffs have alleged that the alleged inclusion of a check with an exposed account number as an exhibit to earlier Motions to Dismiss is somehow the basis for liability under the State common-law theory of "public disclosure of private facts".

88.    Pursuant to Fla. Stat. § 718.111(12) (2020): "The official records of the association are open to inspection by any association or authorized representative of such member at all

reasonable times".

89.     Said association records include all books and ledgers, including copies of Unit owner payments such as the check (and its account number) that is the subject of Plaintiffs' Count 11. Thus, the account number at issue was already non-private information as it was capable of being revealed at any time to any qualified applicant upon normal inspection of the Association's business records.

90.     Additionally, the subject exhibit was only filed in and published on the Federal Court's PACER docketing system.  Access to this system is limited to registered users only, and not simply to the general public as is found with the State Court online dockets.  Thus, Plaintiffs' have failed to allege that anyone other than the Parties involved in this case have accessed the Docket, who could potentially have caused damages, nor have they alleged any concrete, non-speculative damages resulting from such conduct.

91.     Moreover, the potential "views" of the allegedly offensive account number on the PACER system would be limited to the time in which the subject exhibit was first filed (D #6 / 03-24-2021) to the time the Defendant filed its Motion to Seal Exhibits (D#16 / 05-25-2021), to the time that this Honorable Court executed the Agreed Order Sealing Exhibits (D # 17 / 05-27-2021).

92.     Simply put, the Plaintiff's have failed to establish both that the account number included in Defendant's exhibit is actually "private", and, assuming it was, whether any concrete cognizable damages were incurred.

93.     Count 11 is therefore not supported by the facts or common-law and must be dismissed.

### V. CONCLUSION

This Honorable Court should dismiss the FDCPA and FCCPA claims against the Defendant

with prejudice. Plaintiffs have failed to allege proper Article III standing.   Defendant has demonstrated both appropriate disclosure compliance, asserted debts secured with lawful statutory and contractual authority and facts derived directly from the Second Amended Complaint and exhibits attached thereto.  These facts cannot be disputed and leave the Court with no doubt that the Plaintiffs are unable to prove their claim.

**WHEREFORE**, Defendant Kaye Bender Rembaum P.L. respectfully requests this Honorable Court enter an Order granting this Motion to Dismiss Second Amended Complaint with prejudice, awarding attorney's fees and costs, and for any additional relief this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of June, 2021, a true and correct copy of the foregoing has been furnished by electronic filing with the Clerk of the Court via CM/ECF, which will send notice of electronic filing to all counsel of record.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the service list below in the manner specified, either via transmission of notice of electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of filing.

BY:      */s/ Stuart M. Smith*
STUART M. SMITH, ESQ.
Florida Bar No: 9717
Email: ssmith@kbrlegal.com
GERARD S. COLLINS
Florida Bar No: 738050
Email: gcollins@kbrlegal.com
1200 Park Central Boulevard South
Pompano Beach, Florida 33064
(954) 928-0680 - Phone
(954) 772-0319 - Fax

## Jannely Arevalo

**From:** Jannely Arevalo
**Sent:** Monday, March 9, 2020 2:54 PM
**To:** 'besposito@pmaventures.com'
**Subject:** Sabal Ridge Apts vs. Pope / 750 South Ocean Boulevard #1-S
**Attachments:** 20200309141750502.pdf

Good Afternoon
In regards to the above referenced matter, please see attached correspondence in response to your letter dated December 13, 2019.

Regards,



*Jannely Arevalo*
**Collections Paralegal**
**Kaye Bender Rembaum** P.L.
**Attorneys At Law**
www.KBRLegal.Com
**1200 Park Central Boulevard South**
**Pompano Beach, Florida 33064**
**Area Code ( 954 )**
Main   928-0680
Fax     772-0319
Jannely@KBRLegal.com

**2014, 2015, 2016, 2017 DIAMOND WINNER FOR BEST LAW FIRM!!**

This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for that purpose.

PERSONAL & CONFIDENTIAL
This email and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying or other use of this message or its attachments is strictly prohibited. If you have received this message in error, please notify the sender immediately by telephone at 954-928-0680 or by electronic mail, and delete this message and all copies and backups thereof. Thank you.





ROBERT L. KAYE, B.C.S.*
MICHAEL S. BENDER, B.C.S.*
JEFFREY A. REMBAUM, B.C.S.*
DEBORAH S. SUGARMAN
ANDREW B. BLACK, B.C.S.*
PETER C. MOLLENGARDEN, B.C.S.*
GERARD S. COLLINS
SHAWN G. BROWN, B.C.S.*
JEFFREY D. GREEN
EMILY E. GANNON
DANIELLE M. BRENNAN
LAUREN T. SCHWARZFELD
ALLISON L. HERTZ, B.C.S.*
JAY S. LEVIN
KARINA N. SKEIE
OLIVIA L. CATO
AMY O. EISENBERG
KERSTIN HENZE, OF COUNSEL
LISA A. MAGILL, B.C.S.*, OF COUNSEL

*MAIN OFFICE:*
1200 PARK CENTRAL BLVD SOUTH
POMPANO BEACH, FL 33064
TEL. (954) 928-0680
FAX (954) 772-0319
(800) 974-0680

WITH ADDITIONAL OFFICES IN:
PALM BEACH GARDENS
TAMPA
MIAMI

*BOARD CERTIFIED SPECIALIST IN
CONDOMINIUM AND PLANNED
DEVELOPMENT LAW

DSUGARMAN@KBRLEGAL.COM

*KBRLegal.Com*

March 9, 2020

**Via Fax: (888) 718-8862**

Brandon Esposito
JK Law, P.A.
925 S. Federal Highway, Suite 125
Boca Raton, FL 33432

Re:   Sabal Ridge Apartment Association, Inc.
       Owner: Gregory Harold Pope and Michele Bernadette Pope
       Property address: 750 S. Ocean Blvd. #1-S, Boca Raton, FL 33432
       File No.: 20344.0001

Dear Mr. Esposito:

We have received your letter dated December 13, 2019 regarding the above-referenced matter and dispute the allegations contained therein. Your clients' account remains delinquent and the Association will proceed with further legal action if the outstanding delinquency is not resolved.

As your clients are aware, regular quarterly assessments are owed to the Association. Additionally, as your clients are also aware, there have been several special assessments that have come due and your clients have failed to make timely payments. In response to your inquiry concerning interest, in accordance with the Declaration of Condominium for Sabal Ridge Apartments, interest on delinquent assessments accrues at the highest rate per annum (18%).

In response to your letter, enclosed is the full and complete validation evidencing your clients' debt to the Association. Specifically, enclosed is an account

Gregory Harold Pope and Michele Bernadette Pope
March 9, 2020
Page 2

history with the Association reflecting the details of the outstanding balance owed (the clients' ledger does not reflect interest, attorney's fees and costs) and all supporting documentation for the special assessments. Additionally, enclosed is a ledger reflecting the full balance now due of **$47,627.69**, which includes interest, attorney's fees and costs. Your clients must make arrangements to resolve the full amount owed or the Association will have no alternative but to proceed with further legal action. Payment in full or acceptable payment arrangements must be made by **March 20, 2020** or the Association will proceed accordingly.

Should you have further questions or wish to discuss this matter in greater detail, please contact our office.

Very truly yours,

Deborah S. Sugarman

DSS:cs
Enclosure
cc:   Peter Mollengarden, Esquire
      besposito@pmaventures.com

KAYE BENDER REMBAUM, P.L.

# KAYE BENDER REMBAUM

### ACCOUNT STATUS
### 3/9/2020

POPE , GREGORY HAROLD
POPE , MICHELE BERNADETTE

| | |
|---|---|
| ASSOCIATION | SABAL RIDGE APARTMENTS      CLIENT ID# 20344.0001 |
| UNIT # | 1-S |
| STATUS | COLLECTIONS |
| ADDRESS | 750 SOUTH OCEAN BOULEVARD #1-S, BOCA RATON, FLORIDA 33432 |
| ATTORNEY | INTEREST RATE                                     18.00 |

| DATE | CHARGE TYPE | ASSESSMENT | INTEREST | LATE FEES | ATTY FEES | COSTS | APPLIED | LINE BALANCE |
|---|---|---|---|---|---|---|---|---|
| 04/01/16 | R | 7,961.94 | 314.11 | 0.00 | 0.00 | 0.00 | 8,276.05 | 0.00 |
| 04/01/16 | B/SA | 10,973.16 | 453.98 | 0.00 | 0.00 | 0.00 | 11,427.14 | 0.00 |
| 04/15/16 | S/A | 2,295.83 | 130.20 | 0.00 | 0.00 | 0.00 | 2,426.03 | 0.00 |
| 07/01/16 | R | 7,961.94 | 180.26 | 0.00 | 0.00 | 0.00 | 8,142.20 | 0.00 |
| 07/15/16 | S/A | 2,295.83 | 90.57 | 0.00 | 0.00 | 0.00 | 2,386.40 | 0.00 |
| 09/15/16 | S/A | 92,987.20 | 947.65 | 0.00 | 0.00 | 0.00 | 93,934.85 | 0.00 |
| 10/01/16 | R | 7,961.94 | 482.05 | 0.00 | 0.00 | 0.00 | 8,443.99 | 0.00 |
| 10/15/16 | S/A | 2,295.83 | 174.90 | 0.00 | 0.00 | 0.00 | 2,470.73 | 0.00 |
| 01/01/17 | R | 7,961.94 | 310.19 | 0.00 | 0.00 | 0.00 | 8,272.13 | 0.00 |
| 01/15/17 | S/A | 2,295.83 | 73.59 | 0.00 | 0.00 | 0.00 | 2,369.42 | 0.00 |
| 02/15/17 | S/A | 92,987.20 | 3,419.35 | 0.00 | 0.00 | 0.00 | 96,406.55 | 0.00 |
| 04/01/17 | R | 7,961.94 | 782.61 | 0.00 | 0.00 | 0.00 | 8,744.55 | 0.00 |
| 04/15/17 | S/A | 2,295.83 | 332.39 | 0.00 | 0.00 | 0.00 | 2,628.22 | 0.00 |
| 07/01/17 | R | 7,961.94 | 1,065.93 | 0.00 | 0.00 | 0.00 | 9,027.87 | 0.00 |
| 07/15/17 | S/A | 2,295.83 | 497.03 | 0.00 | 0.00 | 0.00 | 2,792.86 | 0.00 |
| 10/01/17 | R | 7,961.94 | 2,060.95 | 0.00 | 0.00 | 0.00 | 10,022.89 | 0.00 |
| 10/15/17 | S/A | 2,295.83 | 653.28 | 0.00 | 0.00 | 0.00 | 2,949.11 | 0.00 |
| 01/01/18 | R | 7,961.94 | 1,983.38 | 0.00 | 0.00 | 0.00 | 9,945.32 | 0.00 |
| 01/15/18 | S/A | 2,295.83 | 598.94 | 0.00 | 0.00 | 0.00 | 2,894.77 | 0.00 |
| 04/01/18 | R | 7,961.94 | 1,778.67 | 0.00 | 0.00 | 0.00 | 9,740.61 | 0.00 |
| 04/15/18 | S/A | 2,295.83 | 497.04 | 0.00 | 0.00 | 0.00 | 2,792.87 | 0.00 |
| 07/01/18 | R | 7,961.94 | 1,421.36 | 0.00 | 0.00 | 0.00 | 9,383.30 | 0.00 |
| 07/15/18 | S/A | 2,295.83 | 394.01 | 0.00 | 0.00 | 0.00 | 2,689.84 | 0.00 |
| 10/01/18 | R | 7,961.94 | 1,060.14 | 0.00 | 0.00 | 0.00 | 9,022.08 | 0.00 |
| 10/15/18 | S/A | 2,295.83 | 289.85 | 0.00 | 0.00 | 0.00 | 2,585.68 | 0.00 |
| 01/01/19 | R | 8,160.49 | 716.33 | 0.00 | 0.00 | 0.00 | 8,876.82 | 0.00 |
| 01/15/19 | S/A | 2,295.83 | 185.69 | 0.00 | 0.00 | 0.00 | 2,481.52 | 0.00 |
| 04/01/19 | R | 8,160.49 | 354.14 | 0.00 | 0.00 | 0.00 | 8,514.63 | 0.00 |
| 04/15/19 | S/A | 99,525.29 | 9,059.76 | 0.00 | 0.00 | 0.00 | 86,479.15 | 22,105.90 |
| 07/01/19 | R | 8,160.49 | 1,014.14 | 0.00 | 0.00 | 0.00 | 768.65 | 8,405.98 |
| 10/01/19 | R | 8,160.49 | 643.90 | 0.00 | 0.00 | 0.00 | 398.41 | 8,405.98 |

| Date | Type | | | | | | | |
|------|------|------|------|------|--------|-------|-----------|------------|
| 11/15/19 | O | 0.00 | 0.00 | 0.00 | 250.00 | 10.65 | 260.65 | 0.00 |
| 12/09/19 | DTA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 01/01/20 | R | 8,237.04 | 276.22 | 0.00 | 0.00 | 0.00 | 28.43 | 8,484.83 |
| 03/09/20 | O | 0.00 | 0.00 | 0.00 | 225.00 | 0.00 | 0.00 | 225.00 |
| TOTAL | | | | | | | | |
| CHARGES | | $452,483.15 | $32,242.61 | $0.00 | $475.00 | $10.65 | | $485,211.41 |
| APPLIED | | $406,464.80 | $30,858.27 | $0.00 | $250.00 | $10.65 | $437,583.72 | |
| BALANCE | | $46,018.35 | $1,384.34 | $0.00 | $225.00 | $0.00 | | $47,627.69 |

## BALANCE DUE $47,627.69

**PAYMENT-HISTORY:**

| DATE | PAYMENTS | TYPE | CHECK# |
|------|----------|------|--------|
| 06/20/16 | $7,961.94 | A | 00269 |
| 06/20/16 | $8,627.33 | A | 00269 |
| 06/20/16 | $2,295.83 | A | 00269 |
| 08/08/16 | $7,961.94 | A | 00337 |
| 08/08/16 | $2,295.83 | A | 00337 |
| 10/03/16 | $42,987.20 | A | 00430 |
| 10/03/16 | $50,000.00 | A | 00422 |
| 11/29/16 | $7,961.94 | A | 00520 |
| 03/16/17 | $7,961.94 | A | 98802 |
| 03/21/17 | $50,000.00 | A | 00118 |
| 05/07/17 | $42,987.20 | A | 00161 |
| 08/07/17 | $14,849.43 | A | 00271 |
| 10/19/17 | $7,961.94 | A | 305 |
| 01/24/18 | $2,295.83 | A | 313 |
| 02/08/18 | $7,961.94 | A | 321 |
| 09/19/18 | $2,295.83 | A | ASSOC |
| 09/27/18 | $7,961.94 | A | 00352 |
| 03/05/19 | $4,591.66 | A | 391 |
| 05/15/19 | $2,295.83 | A | 00165 |
| 05/15/19 | $15,923.88 | A | 00165 |
| 06/28/19 | $50,000.00 | A | 0208 |
| 06/28/19 | $49,525.29 | A | 00220 |
| 10/08/19 | $8,160.49 | A | 00364 |
| 12/06/19 | $24,481.47 | T | 551 |
| 01/08/20 | $8,237.04 | A | 557 |

| | |
|------|------|
| $413,102.25 | TOTAL ASSOCIATION RECEIVED |
| $24,481.47 | TOTAL RECEIVED INTO TRUST |

$437,583.72   GRAND TOTAL RECEIVED

DISBURSAL-HISTORY:
DATE    DISBURSMENT TYPE
12/09/19        $24,481.47  DTA

        $24,481.47   TOTAL DISBURSED TO ASSOCIATION
            $0.00   TOTAL DISBURSED TO FIRM

        $24,481.47   GRAND TOTAL DISBURSED

            $0.00   BALANCE IN TRUST

Mr. & Mrs. Gregory Pope
#1.5

| Date | Invoice # | Check # | Amount | Invoice # Paid | Balance |
|---|---|---|---|---|---|
| 01/01/2015 | | | | | -0- |
| 01/01/2015 | 3487 | | 7,961.94 | | 7,961.94 |
| 01/13/2015 | 3515 | | 2,295.83 | | 10,257.77 |
| 01/28/2015 | | 436 | 7,961.94 | 3487 | 2,295.83 |
| 01/28/2015 | | 437 | 2,295.83 | 3515 | -0- |
| 04/01/2015 | 3528 | | 7,961.94 | | 7,961.94 |
| 04/06/2015 | 3554 | | 2,295.83 | | 10,257.77 |
| 04/13/2015 | | 00049... | 7,961.94 | 3528 | 2,295.83 |
| 07/01/2015 | 3567 | | 7,961.94 | | 10,257.77 |
| 07/02/2015 | 3595 | | 2,295.83 | | 12,553.60 |
| 07/28/2015 | | 00227... | 2,295.83 | 3595 | 10,257.77 |
| 07/28/2015 | | 00227... | 7,961.94 | 3567 | 2,295.83 |
| 10/01/2015 | 3605 | | 7,961.94 | | 10,257.77 |
| 10/15/2015 | 3635 | | 2,295.83 | | 12,553.60 |
| 10/21/2015 | | 20151... | 7,936.94 | 3605 | 4,616.66 |
| 01/01/2016 | 3645 | | 7,961.94 | | 12,578.60 |
| 01/14/2016 | 3673 | | 2,295.83 | | 14,874.43 |
| 03/01/2016 | | 20160... | 7,934.94 | 3645 | 6,939.49 |
| 04/01/2016 | | 515 | 4,594.66 | 3635 & 3673 | 2,345.83 |
| 03/31/2016 | | 524 | 8,427.29 | 3712 | (6,081.46) |
| 04/01/2016 | 3712 | | 17,154.66 | | 10,977.26 |
| 04/01/2016 | 3685 | | 7,961.94 | | 18,935.10 |
| 04/15/2016 | 3740 | | 2,295.83 | | 21,230.93 |
| 06/20/2016 | | 00268... | 2,295.83 | 3740 ✓ | 18,935.10 |
| 06/20/2016 | | 00269... | 7,961.94 | 3685 ✓ | 10,973.16 |
| 06/20/2016 | | 00269... | 8,627.33 | 3712 ✓ | 2,345.83 |
| 07/01/2016 | 3750 | | 7,961.94 | | 10,307.77 |
| 07/09/2016 | 3787 | | 2,295.83 | | 12,603.60 |
| 08/08/2016 | | 00337... | 2,295.83 | 3787 ✓ | 10,307.77 |
| 08/08/2016 | | 00337... | 7,961.94 | 3750 ✓ | 2,345.83 |
| 09/14/2016 | 3811 | | 92,987.20 | | 95,333.03 |
| 10/01/2016 | 3815 | | 7,961.94 | | 103,294.97 |
| 10/03/2016 | | 00430... | 42,987.20 | 3811 ✓ | 60,307.77 |
| 10/03/2016 | | 00422... | 50,000.00 | 3811 ✓ | 10,307.77 |
| 11/01/2016 | 3851 | | 2,295.83 | | 12,603.60 |
| 11/29/2016 | | 00520... | 7,961.94 | 3815 ✓ | 4,641.66 |
| 01/01/2017 | 3862 | | 7,961.94 | | 12,603.60 |
| 02/05/2017 | 3899 | | 92,987.20 | | 105,590.80 |
| 03/16/2017 | | 98802 | 7,961.94 | 3862 ✓ | 97,628.84 |

Mr & Mrs Gregory Pape
# 1-5          Pg 2

| | Date | Invoice # | Check # | Amount | Invoice # Paid | Balance |
|---|---|---|---|---|---|---|
| | | | | | | 97,628.86 |
| | 03/19/2017 | 3914 | | 2,295.83 | | 99,924.69 |
| | 03/21/2017 | | 00118... | 50,000.00 | 3899 ✓ | 49,924.69 |
| 4/1 | 03/20/2017 | 3924 | | 7,961.94 | | 57,886.63 |
| | 04/06/2017 | 3952 | | 2,295.83 | | 60,182.06 |
| | 05/02/2017 | | 00161. | 42,987.20 | 3899 ✓ | 17,195.26 |
| '1/1 | 06/19/2017 | 3980 | | 7,961.94 | | 25,157.20 |
| | 07/10/2017 | 4009 | | 2,295.83 | 3851 3914 | 27,453.63 |
| | 08/07/2017 | | 00271... | 14,849.43 | 3924 3952 | 12,603.60 |
| 10/1 | 08/30/2017 | 4032 | | 7,961.94 | | 20,565.54 |
| | 10/19/2017 | | 205 | 7,961.94 | 4030 ✓ | 12,603.60 |
| | 11/07/2017 | 4058 | | 2,295.83 | | 14,899.43 |
| 2019 | 12/05/2017 | 4077 | | 7,961.94 | | 22,861.37 |
| '1/1 | 01/24/2018 | | 313 | 2,295.83 | 4058 ✓ | 20,565.54 |
| | 01/24/2018 | 4106 | | 2,295.83 | | 22,861.37 |
| | 02/08/2018 | | 321 | 7,961.94 | 4077 ✓ | 14,899.43 |
| 4/1 | 03/19/2018 | 4137 | | 7,961.94 | | 22,861.37 |
| | 05/06/2018 | 4155 | | 2,295.83 | | 25,157.20 |
| 7/1 | 06/18/2018 | 4164 | | 7,961.94 | | 33,119.14 |
| | 08/12/2018 | 4191 | | 2,295.83 | | 35,414.97 |
| 10/1 | 09/19/2018 | 4209 | | 7,961.94 | | 43,376.91 |
| | 09/19/2018 | | no # listed | 2,295.83 | 4191 ✓ | 41,081.08 |
| | 09/27/2018 | | 00352... | 7,961.94 | 4164 ✓ | 33,119.14 |
| 2019 | 10/24/2018 | 4237 | | 8,160.49 | | 41,279.63 |
| '1/1 | 01/08/2019 | 4272 | | 4,591.66 | | 45,871.29 |
| | 03/05/2019 | | 391 | 4,591.66 | 4273 ✓ | 41,279.63 |
| | 03/17/2019 | 4282 | | 99,525.29 | | 140,804.92 |
| | 03/18/2019 | 4270 | | 8,160.49 | | 148,965.41 |
| 4/1 | 05/15/2019 | | 00165... | 2,295.83 | 4155 ✓ | 146,669.58 |
| | 05/15/2019 | | 00165... | 15,922.88 | 4127 4209 | 130,745.70 |
| 7/1 | 06/11/2019 | 4356 | | 8,160.49 | | 138,906.19 |
| | 06/28/2019 | | 00220... | 49,525.29 | 4282 ✓ | 89,380.90 |
| | 06/28/2019 | | 00208... | 50,000.00 | 4282 ✓ | 39,380.90 |
| 10/1 | 08/10/2019 | 4397 | | 8,160.49 | | 47,541.39 |
| | 10/08/2019 | | 00364... | 8,160.49 | 4237 ✓ | 39,380.90 |

SABAL RIDGE APARTMENT ASSN, INC.
FINANCIAL TRANSACTIONS - 02/13/20

750 S OCEAN BLVD # 1S
GREG POPE

Unit ID: 1S
STATUS: 07 - ATTORNEY
PREPAID BAL:      0.00

| TXN DATE | PAYMT AMT | CHECK # | DEP DT | CODE | N/A | DESCRIPTION | AMOUNT | BALANCE DUE |
|----------|-----------|---------|--------|------|-----|-------------|--------|-------------|
| 113019 | | EXPENSE ADJ | | 09 | T | SET UP BALANCE | 50.00 | 50.00 |
| 113019 | | EXPENSE ADJ | | 09 | | SET UP BALANCE | 25.00 | 75.00 |
| 113019 | | EXPENSE ADJ | | 09 | | SET UP BALANCE | 7961.94 | 8036.94 |
| 113019 | | EXPENSE ADJ | | 09 | | SET UP BALANCE | 8160.49 | 16197.43 |
| 113019 | | EXPENSE ADJ | | 09 | | SET UP BALANCE | 8160.49 | 24357.92 |
| 113019 | | EXPENSE ADJ | | 09 | | SET UP BALANCE | 8160.49 | 32518.41 |
| 113019 10/1/15 BALANCE, 1/1/16 BALANCE, 3RD QTR 2017, 2ND | | | | | | | | |
| 113019 QTR 2019, 3RD QTR 2019, 4TH QTR 2019 | | | | | | | | |
| 113019 | | EXPENSE ADJ | | 10 | | S/A SET UP BAL | 2295.83 | 34814.24 |
| 113019 | | EXPENSE ADJ | | 10 | | S/A SET UP BAL | 2295.83 | 37110.07 |
| 113019 | | EXPENSE ADJ | | 10 | | S/A SET UP BAL | 2295.83 | 39405.90 |
| 113019 2ND QTR 2015 S/A, 3RD QTR 2017, 1ST QTR 2018 | | | | | | | | |
| ------ | | | | | | | | |
| 010120 | | APPLY CHARGES | | A1 | | ASSESSMENT | 8237.04 | 47642.94 |
| 010820 | 8237.04 | 557 | 010820 | A1 | | ASSESSMENT | (8237.04) | 39405.90 |
| ------ | | | | | | | | |
| 020720 | 24481.47 | 30561ATTY | 020720 | 09 | | SET UP BALANCE | (24481.47) | 14924.43 |

-- End of report --

**SABAL RIDGE APARTMENT ASSOCIATION, INC.**
**BOARD OF DIRECTORS MEETING**
**MARCH 4, 2016**
**A SPECIAL ASSESSMENT WILL BE CONSIDERED**

On Friday, March 4, 2016, at 5:30 PM, or immediately following the Annual Meeting, in the Sabal Ridge Lobby Sitting Room, a Board of Directors Meeting will be held to approve a Special Assessment. Any Member of the Association has a right to speak on any Agenda Item for a maximum of three (3) minutes for each Agenda Item, provided they sign the register prior to the Meeting indicating Agenda Items to be addressed.

An identification of Agenda Items is as follows:

    1. Certifying Quorum. Call to Order.

    2. Proof of Notice of Meeting: Posted and Mailed February 9, 2016.

    3. Special Business:

        **SPECIAL ASSESSMENT to be levied against unit owners for expenses incurred, or to be incurred, prior to obtaining financing for the elevator modernization and garage water mitigation/concrete replacement projects. These costs are over and above those anticipated by the Annual Budget.**

| | |
|---|---|
| $ 193,500.00 | Architectural fees including civil engineering, landscape architect, arborist and MEP (mechanical, electrical, plumbing) engineering. |
| 54,000.00 | EBL Construction Management – through April 30th |
| 30,852.00 | Karins Engineering – structural engineering – paid to date |
| 65,500.00 | Otis Elevator – elevator modernization – contract deposit |
| 262,000.00 | Otis Elevator – elevator modernization – per contract – due upon delivery of materials |
| **$ 605,852.00** | **TOTAL** |

        **Review/Discussion/Motion**

    4. Adjournment

                                  For the Board of Directors

                                  Theodore Boinis
                                  Vice President

Posted: February 10, 2016

**SABAL RIDGE APARTMENT ASSOCIATION INC**

**SPECIAL ASSESSMENT - MARCH 4, 2016**

| UNIT # | NAME | PERCENT | Due 1-Apr-16 | Due 1-Apr-16 1-May-16 |
|---|---|---|---|---|
| | | | ONE PAYMENT | TWO PAYMENTS |
| 1N | SABAL RIDGE | 1.722% | 10,432.77 | 5,216.39 |
| 1S | POPE | 2.848% | 17,254.66 | 8,627.33 |
| 2N | SHUFF | 3.003% | 18,193.74 | 9,096.87 |
| 2S | DOSTIE | 3.003% | 18,193.74 | 9,096.87 |
| 3N | KIMMEL - BETTIUS | 3.025% | 18,327.02 | 9,163.51 |
| 3S | MULVIHILL | 3.025% | 18,327.02 | 9,163.51 |
| 4N | SPENCER | 3.047% | 18,460.31 | 9,230.16 |
| 4S | POLOKOFF | 3.047% | 18,460.31 | 9,230.16 |
| 5N | DUBROW | 3.069% | 18,593.60 | 9,296.80 |
| 5S | BOINIS | 3.069% | 18,593.60 | 9,296.80 |
| 6N | DICK | 3.091% | 18,726.89 | 9,363.44 |
| 6S | JEELOF | 3.091% | 18,726.89 | 9,363.44 |
| 7N | KALLMAN | 3.113% | 18,860.17 | 9,430.09 |
| 7S | SOBEL | 3.113% | 18,860.17 | 9,430.09 |
| 8N | GRAVES | 3.135% | 18,993.46 | 9,496.73 |
| 8S | ANDERSON | 3.135% | 18,993.46 | 9,496.73 |
| 9N | HILLENBRAND | 3.157% | 19,126.75 | 9,563.37 |
| 9S | HILLENBRAND | 3.157% | 19,126.75 | 9,563.37 |
| 10N | TEICH | 3.180% | 19,266.09 | 9,633.05 |
| 10S | POLK | 3.180% | 19,266.09 | 9,633.05 |
| 11N | SUGAR | 3.202% | 19,399.38 | 9,699.69 |
| 11S | SUGAR | 3.202% | 19,399.38 | 9,699.69 |
| 12N | DESHIELDS | 3.224% | 19,532.67 | 9,766.33 |
| 12S | ACKERMAN | 3.224% | 19,532.67 | 9,766.33 |
| 14N | LEVINE | 3.268% | 19,799.24 | 9,899.62 |
| 14S | KATZ | 3.268% | 19,799.24 | 9,899.62 |
| 15N | SHARLIN | 3.312% | 20,065.82 | 10,032.91 |
| 15S | VAN WINKLE | 3.312% | 20,065.82 | 10,032.91 |
| 16N | DOSHI | 3.356% | 20,332.39 | 10,166.20 |
| 16S | DOSHI | 3.356% | 20,332.39 | 10,166.20 |
| 17N | KULLY | 3.533% | 21,404.75 | 10,702.38 |
| 17S | PAINO | 3.533% | 21,404.75 | 10,702.38 |
| | TOTAL | 100.000% | $605,852.00 | $302,926.00 |

# *Sabal Ridge Apartment Association, Inc.*

750 SOUTH OCEAN BOULEVARD • BOCA RATON, FLORIDA 33432
Telephone: 561-395-9122 • Facsimile: 561-368-9548

September 7, 2016

To All Unit Owners:

Enclosed is a Special Assessment Notice plus spreadsheets on the various methods of payment approved by the Board of Directors at the Special Meeting of the Board of Directors on August 24, 2016.

As you can see, you will have three (3) options:

1. payment in full on September 15, 2016

2. two equal payments – one on September 15, 2016 and the second on February 15, 2017

3. quarterly installments starting on September 15, 2016 and each quarter thereafter – December 15, March 15 and June 15, for eleven (11) years with 4.09% interest

Please notify me of your payment preference by September 12th, and I will send you the corresponding invoice for payment.

Should you have any questions, please contact me at the management office: (561) 395-9122.

Sincerely,

Ann Lattanzio, CAM

## NOTICE OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF

## SABAL RIDGE APARTMENT ASSOCIATION, INC.

A Special Meeting of the Board of Directors of Sabal Ridge Apartment Association, Inc. will be held on **Wednesday, August 24, 2016, at 5:00 P.M. EDT, in the Sitting Room of the Sabal Ridge Apartments Condominium located at 750 South Ocean Boulevard, Boca Raton, Florida 33432,** for the purpose of (1) considering the adoption of a Special Assessment of $ 6,530,000.00 (plus interest on the loan with Bank of America, such interest rate to be determined as of the date of the closing of the loan which is for a term of eleven (11) years) for (a) replacement of garage ceiling/parking deck slab and repair, restoration or replacement of related areas, (b) modernization of the mechanical systems of the two (2) elevators and renovating the interior of the cabs of the elevators, (c) first floor and garage lobby renovations, (d) replacement of building tower exterior resident storage units, (e) engineering and architectural costs related to the slab replacement project, (f) repayment of the loan with Bank of America being entered into by the Association with respect to the foregoing described projects, and (2) considering the approval of pledging or assigning the Special Assessment as collateral for the loan with Bank of America and approval of the loan and loan documents.

## AGENDA

1. Call to Order;

2. Establishment of a Quorum;

3. Proof of Notice of Meeting: Posted and sent First Class Mail to all Unit Owners – August 9, 2016;

4. Consideration of adoption of a Special Assessment of Six Million Five Hundred Thirty Thousand Dollars ($ 6,530,000.) plus interest on the eleven (11) year loan from Bank of America (such interest rate to be determined at the time of closing of the loan) for (1) the replacement of the garage ceiling/parking deck slab and the repair, restoration or replacement of related areas, (2) modernization of the mechanical systems of the two (2) elevators and renovating the interiors of the cabs of the elevators, (3) first floor and garage lobby renovations, (4) replacement of the building tower exterior resident storage units, (5) engineering and architectural costs related to the slab replacement project, (6) repayment of the loan with Bank of America being entered into by the Association with respect to the foregoing described projects. If adopted, each unit in the Sabal Ridge Apartments Condominium will be assessed its share of the Special Assessment pursuant to the provisions of the Declaration of Condominium and the Board of Directors will determine the amount(s) and due date or dates for the payment of such Special Assessment based upon which owners either elect to pay their share in a lump sum payment or in installments over the course of the Association's loan with Bank of America (such installments to include the owner's share of interest on the loan).

5. Consideration of approving the pledging/assigning of the Association's right, title and interest to the above described Special Assessment as collateral for the loan with Bank of America, and approval of borrowing up to $ 6,530,000.00 from Bank of America with respect to the Special

Notice of a Special Meeting of the Board of Directors of
Sabal Ridge Apartment Association, Inc. to be held August 24, 2016

Page Two

Assessment projects and the loan documents related thereto (Closing Statement, Compliance Certificate, Loan Agreement, Officers Certificate, Promissory Note, Security Agreement and UCC Financing Statement Form).

6.   Adjournment


Dated: August 8, 2016                              Sabal Ridge Apartment Association, Inc.


                                                  By: _____
                                                        Douglas P. Dick, President

| UNIT | NAME | PERCENT | | SPECIAL ASSESSMENT | 2 PAYMENTS |
|---|---|---|---|---|---|
| SABAL RIDGE APARTMENT ASSOCIATION INC | | | | | |
| SCHEDULE OF THE SPECIAL ASSESSMENT APPROVED ON AUGUST 24, 2016 | | | | | |
| DUE SEPTEMBER 16, 2016 | | | | | |
| | | | | | 9/16/2016 |
| # | | | | 9/16/2016 | 2/15/2017 |
| 1N | SABAL RIDGE | 1.722% | | 112,446.60 | 56,223.30 |
| 1S | POPE | 2.848% | | 185,974.40 | 92,987.20 |
| 2N | SHUFF | 3.003% | | 196,095.90 | 98,047.95 |
| 2S | DOSTIE | 3.003% | | 196,095.90 | 98,047.95 |
| 3N | BETTIUS | 3.025% | | 197,532.50 | 98,766.25 |
| 3S | MULVIHILL | 3.025% | | 197,532.50 | 98,766.25 |
| 4N | SPENCER | 3.047% | | 198,969.10 | 99,484.55 |
| 4S | POLOKOFF | 3.047% | | 198,969.10 | 99,484.55 |
| 5N | DUBROW | 3.069% | | 200,405.70 | 100,202.85 |
| 5S | BOINIS | 3.069% | | 200,405.70 | 100,202.85 |
| 6N | DICK | 3.091% | | 201,842.30 | 100,921.15 |
| 6S | JEELOF | 3.091% | | 201,842.30 | 100,921.15 |
| 7N | KALLMAN | 3.113% | | 203,278.90 | 101,639.45 |
| 7S | SOBEL | 3.113% | | 203,278.90 | 101,639.45 |
| 8N | GRAVES | 3.135% | | 204,715.50 | 102,357.75 |
| 8S | ANDERSON | 3.135% | | 204,715.50 | 102,357.75 |
| 9N | HILLENBRAND | 3.157% | | 206,152.10 | 103,076.05 |
| 9S | HILLENBRAND | 3.157% | | 206,152.10 | 103,076.05 |
| 10N | TEICH | 3.180% | | 207,654.00 | 103,827.00 |
| 10S | POLK | 3.180% | | 207,654.00 | 103,827.00 |
| 11N | SUGAR | 3.202% | | 209,090.60 | 104,545.30 |
| 11S | SUGAR | 3.202% | | 209,090.60 | 104,545.30 |
| 12N | DESHIELDS | 3.224% | | 210,527.20 | 105,263.60 |
| 12S | ACKERMAN | 3.224% | | 210,527.20 | 105,263.60 |
| 14N | LEVINE | 3.268% | | 213,400.40 | 106,700.20 |
| 14S | KATZ | 3.268% | | 213,400.40 | 106,700.20 |
| 15N | SHARLIN | 3.312% | | 216,273.60 | 108,136.80 |
| 15S | VAN WINKLE | 3.312% | | 216,273.60 | 108,136.80 |
| 16N | DOSHI | 3.356% | | 219,146.80 | 109,573.40 |
| 16S | DOSHI | 3.356% | | 219,146.80 | 109,573.40 |
| 17N | KULLY | 3.533% | | 230,704.90 | 115,352.45 |
| 17S | SERIANNI | 3.533% | | 230,704.90 | 115,352.45 |
| | | | | | |
| | TOTAL | 100.000% | | 6,530,000.00 | 3,265,000.00 |
| | | | | | |
| 1N | | | | -112,446.60 | |
| | | | | $6,417,553.40 | |

**SABAL RIDGE APARTMENT ASSOCIATION INC**
**SCHEDULE OF SPECIAL ASSESSMENT APPROVED AUGUST 24, 2016 WITH 4.09% INTEREST**
**DUE DECEMBER 15, 2017**

| UNIT # | NAME | PERCENT | SPECIAL ASSESSMENT ELEVEN YEARS | MAINTENANCE ASSESSMENT ANNUAL | QUARTERLY |
|---|---|---|---|---|---|
| 1N | SABAL RIDGE | 1.722% | 139,820.11 | 12,710.84 | 3,177.71 |
| 1S | POPE | 2.848% | 231,247.20 | 21,022.34 | 5,255.59 |
| 2N | SHUFF | 3.003% | 243,832.64 | 22,166.46 | 5,541.62 |
| 2S | DOSTIE | 3.003% | 243,832.64 | 22,166.46 | 5,541.62 |
| 3N | BETTIUS | 3.025% | 246,618.96 | 22,328.86 | 5,582.21 |
| 3S | MULVIHILL | 3.025% | 246,618.96 | 22,328.86 | 5,582.21 |
| 4N | SPENCER | 3.047% | 247,405.28 | 22,491.25 | 5,622.81 |
| 4S | POLOKOFF | 3.047% | 247,405.28 | 22,491.25 | 5,622.81 |
| 5N | DUBROW | 3.069% | 249,191.60 | 22,653.64 | 5,663.41 |
| 5S | BOINIS | 3.069% | 249,191.60 | 22,653.64 | 5,663.41 |
| 6N | DICK | 3.091% | 250,977.92 | 22,816.03 | 5,704.01 |
| 6S | JEELOF | 3.091% | 250,977.92 | 22,816.03 | 5,704.01 |
| 7N | KALLMAN | 3.113% | 252,764.24 | 22,978.42 | 5,744.61 |
| 7S | SOBEL | 3.113% | 252,764.24 | 22,978.42 | 5,744.61 |
| 8N | GRAVES | 3.135% | 254,550.56 | 23,140.81 | 5,785.20 |
| 8S | ANDERSON | 3.135% | 254,550.56 | 23,140.81 | 5,785.20 |
| 9N | HILLENBRAND | 3.157% | 256,336.88 | 23,303.21 | 5,825.80 |
| 9S | HILLENBRAND | 3.157% | 256,336.88 | 23,303.21 | 5,825.80 |
| 10N | TEICH | 3.180% | 258,204.39 | 23,472.98 | 5,868.24 |
| 10S | POLK | 3.180% | 258,204.39 | 23,472.98 | 5,868.24 |
| 11N | SUGAR | 3.202% | 259,990.71 | 23,635.37 | 5,908.84 |
| 11S | SUGAR | 3.202% | 259,990.71 | 23,635.37 | 5,908.84 |
| 12N | DESHIELDS | 3.224% | 261,777.03 | 23,797.76 | 5,949.44 |
| 12S | ACKERMAN | 3.224% | 261,777.03 | 23,797.76 | 5,949.44 |
| 14N | LEVINE | 3.268% | 265,349.67 | 24,122.55 | 6,030.64 |
| 14S | KATZ | 3.268% | 265,349.67 | 24,122.55 | 6,030.64 |
| 15N | SHARLIN | 3.312% | 268,922.31 | 24,447.33 | 6,111.83 |
| 15S | VAN WINKLE | 3.312% | 268,922.31 | 24,447.33 | 6,111.83 |
| 16N | DOSHI | 3.356% | 272,494.95 | 24,772.11 | 6,193.03 |
| 16S | DOSHI | 3.356% | 272,494.95 | 24,772.11 | 6,193.03 |
| 17N | KULLY | 3.533% | 286,866.70 | 26,078.63 | 6,519.66 |
| 17S | SERIANNI | 3.533% | 286,866.70 | 26,078.63 | 6,519.66 |
| | **TOTAL** | 100.000% | $8,119,635.00 | $738,144.00 | $184,536.00 |

SABAL RIDGE APARTMENT ASSOCIATION, INC.
BOARD OF DIRECTORS MEETING
MARCH 1, 2019   5:15 PM EST
A SPECIAL ASSESSMENT WILL BE CONSIDERED

A Special Meeting of the Board of Directors of Sabal Ridge Apartment Association, Inc. will be held on Friday, March 1, 2019, at 5:15 P.M. EST or immediately following the Annual Meeting, in the Sitting Room of the Sabal Ridge Apartments Condominium located at 750 South Ocean Boulevard, Boca Raton, Florida 33432, for the purpose of considering the adoption of a Special Assessment of $3,494,567.74 to complete:  (a) replacement of garage ceiling/parking deck slab and repair, restoration or replacement of related areas, (b) modernization of the mechanical systems of two (2) elevators and renovating the interior of the cabs of the elevators, (c) first floor and garage lobby renovations including wall and floor tile, wall coverings and furniture, (d) installing porcelain pavers on the east decks , (e) engineering and architectural costs related to the slab replacement project, (f) landscaping replacement and upgrades, (g) installing concrete pavers in the drive and parking areas to the front of the building, (h) refurbish pool, (i) replace exterior lights, (j) construction administration, (k) replacement of A/C piping in the garage, (l) replace A/C heat exchanger and well pumps, (m) salt-water well repair, (n) gym equipment, (o) garage overhead roll up door, (p) upgraded security system and cameras, (q) outdoor kitchen, and other items as required to complete these projects.

<u>AGENDA</u>

1.  Call to Order;

2.  Establishment of a Quorum;

3.  Proof of Notice of Meeting: Posted and sent First Class Mail to all Unit Owners – February 13, 2019;

4.  Consideration of adoption of a Special Assessment of Three Million Four Hundred Ninety-Four Thousand Five Hundred Sixty-Seven Dollars and 74 Cents ($ 3,494,567.74) to complete: (a) replacement of the garage ceiling/parking deck slab and repair, restoration or replacement of related areas, (b) modernization of the mechanical systems of two (2) elevators and renovating the interiors of the cabs of the elevators, (c) first floor and garage lobby renovations including wall and floor tile, wall coverings and furniture, (d) installing porcelain pavers on the east decks, (e) engineering and architectural costs related to the slab replacement project, (f) landscaping replacement and upgrades, (g) installing concrete pavers in the drive and parking areas to the front of the building, (h) refurbish pool, (i) replace exterior lights, (j) construction administration, (k) replacement of A/C piping in the garage, (l) replace A/C heat exchanger and well pumps, (m) salt-water well repair, (n) gym equipment, (o) garage overhead roll up door, (p) upgraded security system and cameras, (q) outdoor kitchen, and other items as required to complete these projects (please see budget attached). These costs are over and above those included and anticipated by the Annual Budget. If adopted, each unit in the Sabal Ridge Apartments Condominium will be assessed its share of the Special Assessment pursuant to the provisions of the Declaration of Condominium

Board of Directors Meeting
March 1, 2019 – 5:15 PM or immediately following the Annual Meeting
A Special Assessment Will Be Considered
Page Two

(please see unit breakdown attached). The due date for this lump sum payment will be
April 15, 2019.
Review/Discussion/Motion

5. Adjournment

Dated: February 13, 2019

Sabal Ridge Apartment Association, Inc.
For the Board of Directors

By: _____
Peter Kallman, President

# Sabel Ridge
## 2/13/2019

|  | | Budget |
|---|---|---|
| **Hard Costs Garage** | | |
| Construction Cost Base Contract For Garage | | |
| PCCO #1 Roll Up Door | $ | 4,956,163.00 |
| PCCO #2, #9, #14, #22 Added scope, differing field conditions | $ | 47,848.00 |
| PCCO #4 Additional concrete pours | $ | 314,481.00 |
| PCCO #13, #21, #26 Landscape and credit | $ | 66,248.45 |
| PCCO #8 Porcelian pavers and slabs at east deck and pool deck | $ | 209,276.64 |
| PCCO #7 Landscape lighting and replace conduit | $ | 62,282.51 |
| PCCO #3 Concrete pavers - Front | $ | 62,857.80 |
| PCCO #10 Garage level replacement of storm drain lines | $ | 163,455.00 |
| PCCO #11 ADA Ramp & Railing & #16 Railing upgrade at West crash wall | $ | 84,925.43 |
| PCCO #12 Fencing, FPL Vault, Water pipe repair | $ | 68,473.06 |
| PCCO #32 Porte Cochere H Beam, Add'l lobby dec light bollards, Pool lift install | $ | 49,005.80 |
| Direct Purchase outdoor lights | $ | 31,988.18 |
| Other PCCO's | $ | 101,000.00 |
| Subtotal Hard Costs | $ | 180,491.88 |
|  | $ | 6,400,448.47 |
| Credit 1 EBL Shared Savings Contingency | $ | (80,000.00) |
| Credit 2 EBL Buyout savings | $ | (118,898.40) |
| Allowance Remaining | $ | (67,003.00) |
| **GARAGE FINAL CONTRACT** | $ | 6,134,547.07 |
|  | | |
| **Soft Costs** | | |
| EBL Preconstruction Services | | |
| VS Architectural Group | $ | 72,312.00 |
| Construction Administration (VS) | $ | 228,000.00 |
| Structural Engineer (Threshold Inspections) | $ | 19,172.00 |
| Material Testing & Surveyor Avirom & Associates, Inc. | $ | 322,000.00 |
| Geosonics -seismic monitoring | $ | 6,550.00 |
| Owner's Construction Representative | $ | 69,027.00 |
| Legal, Bonds, Permit Fees | $ | 180,000.00 |
| Valet | $ | 217,510.00 |
| Bank Charges | $ | 69,086.00 |
| Land Planner/Charlie Putman | $ | 35,403.00 |
| EDSA - Landscape Design | $ | 15,000.00 |
| Subtotal Soft Costs | $ | 63,200.00 |
|  | $ | 1,324,260.00 |
| **Total Garage Project Costs** | $ | 7,458,807.07 |
|  | | |
| **Additional Infrastructure Maintenance Items** | | |
| Replace A/C piping | | |
| Temp HVAC Cooling tower | $ | 43,000.00 |
| HVAC pumps and contingency | $ | 75,000.00 |
| Refurbish Pool | $ | 100,000.00 |
| Replace A/C heat exchanger | $ | 68,214.00 |
| Centerline wall repair & Diesel storage | $ | 106,000.00 |
| Outdoor kitchen & Retaining wall | $ | 40,000.00 |
| Elevator | $ | 25,000.00 |
| Green Tile Remove Tile, Stucco and Paint | $ | 735,000.00 |
|  | $ | 35,000.00 |
| Power outside items | $ | 1,227,214.00 |
|  | | |
| **Lobby/Office/Fitness Renovation** | | |
| Architect | | |
| Interior Designer | $ | 30,000.00 |
| Furniture, wall and floor tile, and wall coverings | $ | 67,000.00 |
| Gym Equipment | $ | 240,000.00 |
| Closets | $ | 35,000.00 |
| Lobby & Fitness Construction contract | $ | 8,200.00 |
| Total | $ | 1,134,698.87 |
|  | $ | 1,511,898.87 |
|  | | |
| **PCO's and Contingency Pending -** | | |
| Contingency for completion | | |
| Polymeric sand | $ | 100,600.00 |
| **TOTAL PENDING** | $ | 32,000.00 |
| **TOTAL LOBBY AND BASEMENT PROJECT COST** | $ | 132,600.00 |
|  | $ | 1,644,398.87 |
|  | | |
| Total Building Projects | $ | 10,330,419.76 |
|  | | |
| TOTAL Borrowed from Bank | $ | 6,500,000.00 |
| Interest | $ | 255,000.00 |
| Special Assessment #1-N | $ | 60,000.00 |
| Original Assessment March 2018 | $ | 650,852.00 |
|  | | |
| Additional Work | $ | 3,494,567.74 |

| SABAL RIDGE APARTMENT ASSOCIATION INC | | | | |
|---|---|---|---|---|
| SCHEDULE OF A 2018 SPECIAL ASSESSMENT TO COMPLETE GARAGE RE | | | | |
| 1-Mar-18 | | | | |
| CASH PAYMENT | | | | |
| UNIT # | NAME | PERCENT | | SPECIAL ASSESSMENT |
| 1N | SABAL RIDGE | 1.722% | | 60,176.46 |
| 1S | POPE | 2.846% | | 99,525.29 |
| 2N | SHUFF | 3.003% | | 104,941.87 |
| 2S | DOSTIE | 3.003% | | 104,941.87 |
| 3N | BETTIUS | 3.025% | | 105,710.67 |
| 3S | MULVIHILL | 3.025% | | 105,710.67 |
| 4N | LANE | 3.047% | | 106,479.48 |
| 4S | POLOKOFF | 3.047% | | 106,479.48 |
| 5N | DUBROW | 3.069% | | 107,248.28 |
| 5S | BUCK | 3.069% | | 107,248.28 |
| 6N | DICK | 3.091% | | 108,017.09 |
| 6S | STEINMETZ | 3.091% | | 108,017.09 |
| 7N | KALLMAN | 3.113% | | 108,785.89 |
| 7S | SOBEL | 3.113% | | 108,785.89 |
| 8N | GRAVES | 3.135% | | 109,554.70 |
| 8S | ANDERSON | 3.135% | | 109,554.70 |
| 9N | HILLENBRAND | 3.157% | | 110,323.50 |
| 9S | HILLENBRAND | 3.157% | | 110,323.50 |
| 10N | TEICH | 3.180% | | 111,127.25 |
| 10S | POLK | 3.180% | | 111,127.25 |
| 11N | SUGAR | 3.202% | | 111,896.06 |
| 11S | SUGAR | 3.202% | | 111,896.06 |
| 12N | DESHIELDS | 3.224% | | 112,664.86 |
| 12S | ACKERMAN | 3.224% | | 112,664.86 |
| 14N | LEVINE | 3.268% | | 114,202.47 |
| 14S | KATZ | 3.268% | | 114,202.47 |
| 15N | SHARLIN | 3.312% | | 115,740.08 |
| 15S | SUGAR | 3.312% | | 115,740.08 |
| 16N | DOSHI | 3.356% | | 117,277.69 |
| 16S | DOSHI | 3.356% | | 117,277.69 |
| 17N | KULLY | 3.533% | | 123,463.08 |
| 17S | SERIANNI | 3.533% | | 123,463.08 |
| | TOTAL | 100.000% | | 3,494,567.74 |

March 16, 2012


RE: Special Assessment
      Hurricane Impact Resistant Window and Door Project


To All Sable Ridge Unit Owners:

As many of you are aware, after extensive work on the part of the board of directors, we closed our $ 2.M loan with Bank of America on March 9th, allowing us to fund the hurricane impact resistant window and door project.

The loan closed at a rate of 3.49% - lower than the rate the bank originally quoted.

I have enclosed two schedules for the payment of the special assessment for your unit.

- The first is for a cash payment   to the Association. If you are taking this option, payment would be due, in full, on April 1st and I will send you an invoice for the payment of this amount.
- The second option includes financing over a seven year period. Payments would be due quarterly, but on the 15th of the month. The first payment would be also be due on April 15, 2012. Invoices will be sent April 1st.

I will need to meet with a representative of each unit prior to the start of the project to determine what preparation will be needed. Not all window treatments will have to be removed, it depends on how and where they are installed. For example, on interior shutters, most of the time, the frame is back far enough that we only need to remove the shutter panels, and can leave the frame in place.

We will need to clear an area approximately four to six feet in front of the window or door they are installing. All fragile items should be removed if they are in front of an opening, even if they are further back. The openings are, of course, subject to wind gusts. Artwork that is in the general vicinity should also be removed.

Please contact me whenever you are ready, and I will be happy to meet with you to discuss the specifics of your apartment. I do have information on a company that has worked with unit owners in several of the hi-rises along the beach when they were preparing for window projects. They took down window treatments, moved and rehung artwork, etc. This preparation would be a unit owner expense.
Special Assessment - Window and Door Project

March 16, 2012
Page Two

Some general project information: Windows and doors will be brought up on swing stations on the outside of the building. Work crews will be both inside and outside your apartment. The walkway from your front door to the window or door they are working on will be covered. In some cases, a plastic wall will be erected in front of the opening to protect the interior of your unit. We will have a security guard with the crew whenever they are in your unit, and I will also be in the unit and inspecting their work several times each day. Our engineer, Willy Cook, from Bromley-Cook, will be doing periodic inspections and water tests.

As to the time frame, right now we expect the project to start around the beginning of June. Fenexpert USA, our contractor, will have two crews here, and each should complete a unit per week. When the start date gets closer, and I have a more definite schedule, I will be able to give you an idea of when they will be in your apartment.

Should you have any questions, please contact me at the management office: (561) 395-9122.

Sincerely,

Ann Lattanzio
Community Association Manager

**SABAL RIDGE APARTMENT ASSOCIATION INC**
**SCHEDULE OF SPECIAL ASSESSMENT FOR WINDOW AND DOOR REPLACEMENT WITH 3.49% INTEREST**
**DUE JANUARY 15, 2019**

| UNIT # | NAME | PERCENT | SPECIAL MAINTENANCE ASSESSMENT | | | BUDGET |
|---|---|---|---|---|---|---|
| | | | SEVEN YRS. | ANNUAL | QUARTERLY | |
| 1N | SABAL RIDGE | 1.722% | 38,867.78 | 5,552.55 | 1,388.14 | N/A |
| 1S | POPE | 2.848% | 64,283.06 | 9,183.32 | 2,295.83 | |
| 2N | SHUFF | 3.003% | 67,781.61 | 9,683.11 | 2,420.78 | |
| 2S | DOSTIE | 3.003% | 67,781.61 | 9,683.11 | 2,420.78 | |
| 3N | KIMMEL | 3.026% | 68,278.18 | 9,754.05 | 2,438.51 | paid |
| 3S | MULVIHILL | 3.026% | 68,278.18 | 9,754.05 | 2,438.51 | paid |
| 4N | LANE | 3.047% | 68,774.75 | 9,824.99 | 2,456.26 | paid |
| 4S | POLOKOFF | 3.047% | 68,774.75 | 9,824.99 | 2,456.26 | paid |
| 5N | DUBROW | 3.069% | 69,271.32 | 9,895.93 | 2,473.98 | paid |
| 5S | BUCK | 3.069% | 69,271.32 | 9,895.93 | 2,473.98 | paid |
| 6N | DICK | 3.091% | 69,767.89 | 9,966.87 | 2,491.72 | paid |
| 6S | STEINMETZ | 3.091% | 69,767.89 | 9,966.87 | 2,491.72 | paid |
| 7N | KALLMAN | 3.113% | 70,264.46 | 10,037.81 | 2,509.45 | paid |
| 7S | SOBEL | 3.113% | 70,264.46 | 10,037.81 | 2,509.45 | paid |
| 8N | GRAVES | 3.135% | 70,761.03 | 10,108.74 | 2,527.19 | paid |
| 8S | ANDERSON | 3.135% | 70,761.03 | 10,108.74 | 2,527.19 | paid |
| 9N | HILLENBRAND | 3.157% | 71,257.59 | 10,179.68 | 2,544.92 | paid |
| 9S | HILLENBRAND | 3.157% | 71,257.59 | 10,179.68 | 2,544.92 | paid |
| 10N | TEICH | 3.180% | 71,776.73 | 10,253.85 | 2,563.46 | |
| 10S | POLK | 3.180% | 71,776.73 | 10,253.85 | 2,563.46 | |
| 11N | SUGAR | 3.202% | 72,273.30 | 10,324.78 | 2,581.20 | paid |
| 11S | SUGAR | 3.202% | 72,273.30 | 10,324.78 | 2,581.20 | paid |
| 12N | DESHIELDS | 3.224% | 72,769.87 | 10,395.72 | 2,598.93 | |
| 12S | ACKERMAN | 3.224% | 72,769.87 | 10,395.72 | 2,598.93 | paid |
| 14N | LEVINE | 3.268% | 73,763.01 | 10,537.60 | 2,634.40 | paid |
| 14S | KATZ | 3.268% | 73,763.01 | 10,537.60 | 2,634.40 | paid |
| 15N | SHARLIN | 3.312% | 74,756.15 | 10,679.48 | 2,669.87 | paid |
| 15S | SUGAR | 3.312% | 74,756.15 | 10,679.48 | 2,669.87 | paid |
| 16N | DOSHI | 3.366% | 75,749.28 | 10,821.35 | 2,705.34 | paid |
| 16S | DOSHI | 3.366% | 75,749.28 | 10,821.35 | 2,705.34 | paid |
| 17N | KULLY | 3.533% | 79,744.40 | 11,392.09 | 2,848.02 | paid |
| 17S | SERRIANNI | 3.533% | 79,744.40 | 11,392.09 | 2,848.02 | paid |
| TOTAL | | 100.000% | $2,257,130.00 | $322,448.00 | $80,612.00 | |

Notwithstanding anything contained herein, before the ASSO-
CIATION shall have the duty to purchase any DWELLING
pursuant to the terms and conditions hereof, the prospective
purchaser of such DWELLING must be qualified for member-
ship in the ASSOCIATION. As used hereunder, the term
"qualified" shall include, but shall not be limited to including,
the present ability of the said prospective purchaser to fully
comply with and adhere to this Declaration and the several and
various Exhibits hereto, and the Rules and Regulations promul-
gated by the Board of Directors, as said Rules and Regulations
may be from time to time amended.

19. The last sentence of sub-paragraph "E" of Article XXVIII

(Assessments; Liability, Lien and Enforcement) is hereby amended

by striking said existing last sentence and substituting therefor:

Upon actual in said operating reserve of an amount equal to
50% of the current annual assessment, no further payments
shall be collected from the owners of DWELLINGS as a con-
tribution to such operating reserve, unless such operating
reserve shall be reduced below said 50% level, in which event,
contributions to such operating reserve shall be included in the
annual assessment so as to restore said operating reserve to
an amount which will equal 50% of the current annual
amount of said assessment.

20. The last sentence of sub-paragraph "G" of Article XXVIII

(Assessments; Liability, Lien and Enforcement) is hereby amended

by striking said existing last sentence and substituting therefor:

When in default, the delinquent assessment or delinquent
installment thereof due to ASSOCIATION shall bear interest
at the highest lawful rate per annum until such delinquent
assessment or installment thereof, and all interest due thereon,
has been paid in full to ASSOCIATION.

21. The last two sentences of sub-paragraph "J" of Article

XXVIII (Assessments; Liability, Lien and Enforcement) are hereby

amended by striking said existing two sentences and substituting therefor:

The lien granted to the ASSOCIATION shall further secure
such advances for taxes, and payments on account of super-
ior mortgages, liens or encumbrances which may be re-
quired to be advanced by the ASSOCIATION in order to pre-
serve and protect its lien, and the ASSOCIATION shall further
be entitled to interest at the highest lawful rate per annum
on any such advances made for such purpose. All persons,
firms or corporations who shall acquire, by whatever means,
any interest in the ownership of any DWELLING, or who may
be given or acquire a mortgage, lien or other encumbrance
thereon, is hereby placed on notice of the lien granted to the
ASSOCIATION, and shall acquire such interest in any DWELL-
ING expressly subject to such lien.

Exhibit B

that these monies be used for such latter purposes, as a separate assessment may be levied therefor if deemed to be preferable by the Board of Directors of ASSOCIATION in the sole discretion of said Board of Directors.

E. The Board of Directors of ASSOCIATION, in establishing said Annual Budget for operation, management and maintenance of the Project, shall include therein a sum to be collected and maintained as a general operating reserve which shall be used to provide a measure of financial stability during periods of special stress when such sums may be used to meet deficiencies from time to time existing as a result of delinquent payment of assessments by owners of DWELLINGS as a result of emergencies or for other reason placing financial stress upon the ASSOCIATION. The annual amount allocated to such operating reserve and collected therefor shall not exceed 5% of the current annual assessment levied against the owners of all DWELLINGS and their DWELLINGS. Upon accrual in said operating reserve of an amount equal to 25% of the current annual assessment, no further payments shall be collected from the owners of DWELLINGS as a contribution to such operating reserve, unless such operating reserve shall be reduced below said 25% level, in which event, contributions to such operating reserve shall be included in the annual assessment so as to restore said operating reserve to an amount which will equal 25% of the current annual amount of said assessment.

F. All monies collected by ASSOCIATION shall be treated as the separate property of the said ASSOCIATION, and such monies may be applied by the said ASSOCIATION to the payment of any expense of operating and managing the CONDOMINIUM, or to the proper undertaking of all acts and duties imposed upon it by virtue of this Declaration of Condominium and the Articles of Incorporation and By-Laws of said ASSOCIATION and as the monies for any assessment are paid unto ASSOCIATION by any owner of a DWELLING the same may be co-mingled with the monies paid to the said ASSOCIATION by the other owners of DWELLINGS. Although all funds and other assets of ASSOCIATION, and any increments thereto or profits derived therefrom, or from the leasing or use of COMMON ELEMENTS, shall be held for the benefit of the members of ASSOCIATION, no member of said ASSOCIATION shall have the right to assign, hypothecate, pledge or in any manner transfer his membership interest therein, except as an appurtenance to his DWELLING. When the owner of a DWELLING shall cease to be a member of ASSOCIATION by reason of the divestment of his ownership of such DWELLING, by whatever means, ASSOCIATION shall not be required to account to such owner for any share of the funds or assets of ASSOCIATION, or which may have been paid to said ASSOCIATION by such owner, as all monies which any owner has paid to ASSOCIATION shall be and constitute an asset of the ASSOCIATION which may be used in the operation and management of CONDOMINIUM.

G. The payment of any assessment or installment thereof due to ASSOCIATION shall be in default if such assessment, or any installment thereof, is not paid unto ASSOCIATION, on or before the due date for such payment. When in default, the delinquent assessment or delinquent installment thereof due to ASSOCIATION shall bear interest at the rate of 8% per annum until such delinquent assessment or installment thereof, and all interest due thereon, has been paid in full to ASSOCIATION.

H. The owner or owners of each DWELLING shall be personally liable, jointly and severally, as the case may be, to ASSOCIATION for the payment of all assessments, regular or special, which may be levied by ASSOCIATION while such party or parties are owner or owners of a DWELLING in the CONDOMINIUM. In the event that any owner or

22.